# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF FLORIDA
# Orlando Division

| | |
|---|---|
| TEMPORARY SERVICES INSURANCE LTD., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. O'DONNELL; JOSEPH RAYMOND, JR.; KEVIN O'DONNELL; ALS, LLC; ADVANTAGE SERVICES GROUP, LLC; STRATUS SERVICES GROUP, INC.; U.S. TEMPS, INC.; U.S. TECHNICAL CONSULTANTS, INC.; AND CLEARPOINT BUSINESS RESOURCES, INC., <br><br> Defendants. | Case No. 6:07-cv-01507-JA-GJK |

## PLAINTIFF'S EMERGENCY APPLICATION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANTS CLEARPOINT, ALS AND ASG

Plaintiff Temporary Services Insurance Ltd. ("TSIL") hereby moves, pursuant to Rule 65(a), Fed.R.Civ.P, Local Rule 4.06, and FLA. STAT. § 726.108(c), for the entry of a preliminary injunction, pending the outcome of this action:

(i) requiring ClearPoint to make any payments or provide any other consideration ClearPoint would otherwise pay to ALS under the Purchase Agreement into the Registry of this Court;

(ii) preventing ClearPoint from transferring, disposing of, or in any manner conveying any interest in or to any assets it received from ASG II under the Purchase Agreement; and

(iii) preventing ALS and its affiliates from transferring, disposing of or in any manner conveying any interest in or to any consideration provided by ClearPoint to ALS or any of its affiliates pursuant to the Purchase Agreement, including but not limited to selling the ClearPoint Stock it received pursuant to the Purchase Agreement.

In support of this motion, TSIL states:

## TSIL's Need for Emergency Relief

1. TSIL is a creditor of ASG II and was suing ASG II in the Cayman Islands for over $900,000 when ASG II transferred virtually all of its assets to defendant ClearPoint. However, instead of paying ASG II for its assets, ClearPoint paid ASG II's affiliate, defendant ALS. As a result, TSIL has alleged two fraudulent conveyance claims against ClearPoint.

2. TSIL brings this emergency application for a preliminary injunction at this time to preserve the status quo and stop the further dissipation of ASG II's assets. Specifically, as explained in more detail below, TSIL needs injunctive relief by no later than **February 22, 2008** and requests a hearing on this application by that date due to two impending events.

> First, since TSIL filed its complaint in this matter, ClearPoint had not made any further payments to ALS. ALS has recently been pressing ClearPoint to make these payments and has recently sued ClearPoint in this action to force ClearPoint to make those payments. As a result of these actions, *ClearPoint could be forced to make additional payments to ALS*.
>
> Second, as part of the consideration for ClearPoint's purchase of the assets of ASG II, ClearPoint transferred to ALS $2.5 million in ClearPoint common stock. Pursuant to a registration rights agreement, *ALS is able to sell the $2.5 million in ClearPoint common stock* **on February 23, 2008**.

TSIL requests a preliminary injunction to preserve the status quo and to prevent any further disposition of assets that may be used to satisfy ASG II's indebtedness to TSIL.

## Non-Party ASG II's Indebtedness to TSIL

3. In 2003, non-party Advantage Services Group II, LLC ("ASG II") became a shareholder in TSIL and executed a Shareholder Agreement, assuming various financial obligations to TSIL, among other things. (*See* Exhibit 1, Affirmation of Paul Njoka ("Njoka Aff.") at ¶ 3).

4. On July 21, 2006, TSIL invoiced non-party ASG II, an affiliate of ALS and ASG, for $930,170, representing assessments ASG II owes TSIL for the 2005 policy year through August 1, 2006. (Ex. 1, Njoka Aff. at ¶ 5; Exhibit 4, July 21, 2006 letter from Erin Eccles to Michael O'Donnell with Invoice). ASG II refused to pay that invoice. (Ex. 1, Njoka Aff. at ¶ 6).

5. As a result of ASG II's refusal to pay the invoice, on October 11, 2006, TSIL filed a collection action in the Cayman Islands against ASG II (the "Cayman Litigation"), seeking to recover the principal sum of $930,170, plus interest.[1] (Ex. 1, Njoka Aff. at ¶ 7).

6. Since the August 1, 2006 invoice, ASG II's indebtedness to TSIL has continued to grow. Currently, ASG II owes TSIL $3,687,679 in unpaid assessments and interest. (Ex. 1, Njoka Aff. at ¶ 8; Exhibit 5, February 1, 2008 Invoice).

7. On January 29, 2008, the Grand Court of the Cayman Islands awarded summary judgment to TSIL on TSIL's claims against ASG II. (*See* Exhibit 2, Affirmation of James Eldridge ("Eldridge Aff.") at ¶ 6; Exhibit 6, Cayman Islands Summary Judgment Order). The court awarded TSIL $930,170 plus interest and taxes in excess of $230,000, for a total of over $1,160,000. (Ex. 2, Eldridge Aff. at ¶ 7).

### ASG II's Fraudulent Conveyance to ClearPoint

8. Shortly after ASG II was sued for the first $900,000 owed to TSIL, ASG II entered into the Purchase Agreement, pursuant to which on February 23, 2007, approximately four months after TSIL initiated the Cayman Litigation, ASG II sold substantially all of its assets

---

[1] Currently, TSIL is only seeking in the Cayman Litigation the unpaid assessments due as of August 1, 2006. TSIL is not currently seeking in that specific action either the additional unpaid assessments that have become due since August 1, 2006, or premiums and assessments that TSIL would have charged ASG had the Insureds made full and complete disclosure to TSIL.

to ClearPoint.[2]  (Exhibit 7, ALS Counterclaim at page 5, ¶¶ 2-3; and Exhibit 11, Exhibit A to ClearPoint Answer and Cross Claim ("Purchase Agreement") at page 1).

9. Specifically, ASG II sold to ClearPoint (i) all of ASG II's work in progress and all accounts receivable relating to that work; (ii) all of ASG II's furniture, fixtures, equipment, and personal property; (iii) all of ASG II's leases in personal property; (iv) rights to contracts entered into by ASG II; (v) all of ASG II's intellectual property; and (vi) all of ASG II's goodwill.  (*See* Ex. 7, ALS Counterclaim at ¶ 2; Ex. 11, Purchase Agreement at pages 1, 3 and Schedules 1(a)-(b), 4(a)(i)).

10. However, ASG II was paid nothing for the sale of virtually all of its assets. Rather, ClearPoint, the purchaser of ASG II's assets, transferred the following consideration to ALS and nothing to ASG II:  (i) $19 million in cash; (ii) a promissory note in the principal amount of $2.5 million, with interest to accrue at the rate of 7% per annum, to be paid in full 20 months after the closing, and with principal and interest to be paid in equal quarterly payments due on the first calendar day of the quarter; and (iii) $2.5 million in ClearPoint common stock. (*See* Ex. 7, ALS Counterclaim at ¶¶ 3-5, Exhibit A to ALS Counterclaim ("Subordinated Promissory Note"); Ex. 11, Purchase Agreement at page 4).

11. In addition, ClearPoint agreed to make certain "Performance Payments" based on ClearPoint's financial performance in 2007 and 2008.  If ClearPoint achieved certain specified performance targets in 2007, ClearPoint would issue $1 million of ClearPoint common stock to "Seller"[3] within 45 days from December 31, 2007, or by approximately February 15, 2008.  (Ex.

---

[2] The "Effective Date" of the Purchase Agreement is February 23, 2007, and the sale pursuant to the Purchase Agreement was closed that same day.  (Ex. 11, Purchase Agreement at page 1).

[3] The Purchase Agreement defines ALS; ASG II; ALSC, LLC; ALSC II, LLC; ALSC III, LLC; ALSC IV, LLC; and ASG, LLC, as "'Sellers' and individually each a 'Seller.'" (*See* Ex. 11, Purchase Agreement at page 1).  As a result, the identity of the specific entity to receive the Performance Payments is unclear.

11, Purchase Agreement at page 4, ¶ 3(c)).  Similarly, if ClearPoint were to achieve specified performance targets in 2008, ClearPoint would issue $1 million of ClearPoint common stock to "Seller" within 45 days from December 31, 2008, or by approximately February 15, 2009. ClearPoint achieved the specified financial targets in 2007, and under the terms of the Purchase Agreement is required to issue $1 million of ClearPoint common stock by February 15, 2008. (*See* Ex. 7, ALS Counterclaim at p. 5, n.3).

12. As a result of this transaction, ClearPoint has: (i) paid $19 million to ALS; (ii) issued ALS a $2.5 million note at 7% interest; (iii) made certain quarterly payments on that note since February 23, 2007; and (iv) issued $2.5 million in ClearPoint common stock to ALS.  In stark contrast, ClearPoint has paid nothing to ASG II.

### ClearPoint's Required Future Payments under the Purchase Agreement

13. Notwithstanding the payments ClearPoint has already made to ALS, ClearPoint has continuing obligations under the Purchase Agreement which it may be required to fulfill in the future.  Specifically, ClearPoint is to make seven principal and interest payments to ALS on the $2.5 million note on approximately April 1, 2007, July 1, 2007, October 1, 2007, January 1, 2008, April 1, 2008, July 1, 2008, and October 1, 2008.  (*See* Ex. 7, Subordinated Promissory Note; Ex. 11, Purchase Agreement at ¶ 3).  The note must be paid in full by October 23, 2008. (Ex. 7, Subordinated Promissory Note at ¶ 1).

14. In addition, on February 15, 2008, ClearPoint is required under the terms of the Purchase Agreement to make a "Performance Payment" of $1 million of ClearPoint common stock.  (*See* Ex. 7, ALS Counterclaim at p. 5, n.3).

15. As set forth in the Answer, Affirmative Defenses and Counterclaim of ALS, LLC to ClearPoint's Cross Claim, ClearPoint has not made any further payments since the time TSIL's complaint was filed. (*See* Ex. 7, ALS Counterclaim at ¶ 8).

16. Further, counsel for ClearPoint has informed counsel for TSIL that since the time TSIL filed its complaint in this action that ClearPoint has not made any further payments to ALS under the Purchase Agreement and that it was ClearPoint's current intention not to make any further payments to ALS while TSIL's complaint is pending. (Exhibit 3, Affidavit of Jeffrey A. Rossman ("Rossman Aff.") at ¶ 3).

17. However, counsel for ClearPoint recently informed counsel for TSIL that ALS had been pressing ClearPoint to make the payments that were due under the Purchase Agreement between ClearPoint and ALS and, as a result of ALS's actions, it was possible that ClearPoint could be compelled to make further payments to ALS. (Ex. 3, Rossman Aff. at ¶ 4).

### On February 23, 2008 ALS Can Sell the Stock ClearPoint Issued to ALS

18. While ALS is prevented, for a period of one year, from selling any and all ClearPoint stock it receives pursuant to the Purchase Agreement, ALS is thereafter free to sell that stock as it pleases. (Ex. 7, Purchase Agreement at ¶ 3(e)).[4] As a result, ALS will become able to sell the $2.5 million in ClearPoint common stock it received at the closing by approximately February 23, 2008.

### ASG II Has Disposed of Substantially All its Assets

19. On April 24, 2007, the Grand Court of the Cayman Islands entered an injunction

---

[4] As ClearPoint disclosed in its Form 8-K: "In connection with the acquisition, on February 23, 2007, the Company and ASG entered into a registration rights agreement with respect to the shares of common stock issued pursuant to the asset sale and purchase agreement . . . The agreement . . . prohibits the transfer of such shares for one year from the date of the agreement." (Exhibit 10, ClearPoint 8-K at Item 8.01).

against ASG II in the Cayman Litigation (Ex. 2, Eldridge Aff. at ¶ 4; Exhibit 8, Cayman Islands Injunction), enjoining ASG II from: (a) removing any assets it may have in the Cayman Islands; and (b) disposing of, or diminishing the value of, any of its assets, whether in or outside the Cayman Islands, in an amount up to $1,110,000. (*Id.*). The only exception to the disposal of assets contained in the order was for the payment of reasonable legal expenses. (*Id.*). In addition, the court in the Cayman Litigation ordered ASG II to disclose all its assets to TSIL. (*Id.*).

20. In response to the April 24, 2007 injunction, ASG II filed an affidavit in the Cayman Litigation affirmatively representing that, notwithstanding the sale of substantially all of its assets to ClearPoint in a transaction worth a total of at least $24 million, ASG II only had the following assets, in addition to legal claims against TSIL and Zurich American Insurance Company: (i) one preferred share stock in TSIL with an estimated worth of $36,000; (ii) a $10,000 retainer with its attorneys in the Cayman Islands; and (iii) approximately $98,734.23 in accounts receivable due from various third parties in the United States. (Ex. 2, Eldridge Aff. at ¶ 5; Exhibit 9, Affidavit of Michael O'Donnell).

21. Thus, by the time the court in the Cayman Litigation entered the injunction against ASG II, ASG II had already transferred virtually all of its assets to ClearPoint, in exchange for nothing.

22. After ASG II disposed of substantially all of its assets, the Grand Court of the Cayman Islands granted TSIL summary judgment and awarded it the $930,170 sought, in addition to over $230,000 in interest and taxes. (Ex. 2, Eldridge Aff. at ¶¶ 6-7; Ex. 6). Execution of this judgment is stayed until the court disposes of ASG II's recently allowed counterclaims. (Ex. 6). In granting judgment to TSIL, the court noted that ASG II "mounts no

direct defence to TSIL's claim." (Ex. 2, Eldridge Aff. at ¶ 6; Ex. 6 at page 2 of 4). Even though TSIL has been awarded a judgment, as explained below, as a direct result of ASG II's fraudulent conveyance to ClearPoint, ASG II does not have sufficient assets to satisfy that judgment. (Ex. 2, Eldridge Aff. at ¶ 5; Ex. 9).

## Conclusion

This Court should, therefore, enter a preliminary injunction pursuant to FLA. STAT. § 726.108(c) for the purpose of preserving the status quo, preventing any further disposition of assets that may be used to satisfy ASG II's indebtedness to TSIL, and more specifically:

(i) requiring ClearPoint to make any payments or provide any other consideration ClearPoint would otherwise pay to ALS under the Purchase Agreement into the Registry of this Court;

(ii) preventing ClearPoint from transferring, disposing of, or in any manner conveying any interest in or to any assets it received from ASG II under the Purchase Agreement; and

(iii) preventing ALS and its affiliates from transferring, disposing of or in any manner conveying any interest in or to any consideration provided by ClearPoint to ALS or any of its affiliates pursuant to the Purchase Agreement.

## **MEMORANDUM OF LAW**

### I.    INTRODUCTION.

ASG II, while being sued by TSIL for over $900,000 in assessments levied upon it by TSIL, transferred virtually all of its assets to ClearPoint pursuant to the Purchase Agreement. However, instead of paying ASG II for its assets, ClearPoint paid ASG II's affiliate, ALS. This transfer was fraudulent under Florida law. Since the transfer, TSIL has obtained a substantial judgment on its claim for that debt. However, due to the transfer, ASG II is apparently judgment proof, but ClearPoint is currently obligated to make additional payments to ALS pursuant to the Purchase Agreement.

### II.   THE GOVERNING LEGAL STANDARD.

The Florida Uniform Fraudulent Transfer Act (the "Act"), FLA. STAT. § 726.101, *et seq.*, specifically provides for injunctive relief to remedy fraudulent conveyances. Among other remedies provided under Section 108(c)(1) of the Act, "subject to applicable principles of equity and in accordance with applicable rules of civil procedure," a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." Section 108(c)(3) provides that a creditor may obtain "any other relief the circumstances may require." As a general principle of equity, a preliminary injunction should be granted when the moving party shows "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, LLC, 425 F.3d 964, 968 (11th Cir. 2005). TSIL amply satisfies this standard.

### III.     TSIL HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

TSIL has asserted two fraudulent conveyance claims against ClearPoint, one under Section 105(1)(a) of the Act (Count VIII) and one under Section 106(1) of the Act (Count VII). TSIL has a substantial likelihood of success on the merits of each of these claims, and thus satisfies the first element of its request for a preliminary injunction.

#### A.     TSIL Has a Substantial Likelihood of Success on its Section 105(1)(a) Claim.

Under Section 105(1)(a) of the Act, a debtor's transaction is fraudulent as to a creditor when the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor." FLA. STAT. § 726.105(1)(a). TSIL has a substantial likelihood of success on this claim because (1) TSIL is a creditor of ASG II, (2) ASG II intended to defraud TSIL when it entered into the purchase agreement, and (3) the assets ASG II transferred could have been used to satisfy the debt owed to TSIL. *See In re Burton Wiand*, No. 8:05-cv-1856, 2007 U.S. Dist. LEXIS 27294, at *24 (M.D. Fla. Jan. 12, 2007) (citing *Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F. Supp. 1439, 1446 (M.D. Fla. 1998)).

##### 1.     TSIL is a Creditor of ASG II.

TSIL is a undoubtedly a creditor of ASG II. TSIL asserted a right to payment when it invoiced ASG II on July 21, 2006 and when it brought suit against ASG II on October 11, 2006 after ASG II refused to pay that invoice. Indeed, TSIL now has a judgment on that claim.[5] Accordingly, TSIL is a creditor because it has asserted a claim. FLA. STAT. § 726.102(4).

---

[5] Under the Act, TSIL's right to payment need not be reduced to judgment to be a creditor. Even if a claim is contingent, disputed, or legal, it is still a "claim" under the fraudulent transfer statute. FLA. STAT. § 726.102(3). *See Cook v. Pompano Shopper, Inc.*, 582 So.2d 37, 40 (Fla. Dist. Ct. App. 1991) ("A tort claimant or contingent claimant is as fully protected under the Fraudulent Transfer Act as a holder of an absolute claim."). The fact that TSIL has been awarded a substantial judgment against the now apparently judgment proof ASG II only emphasizes the need for an injunction to preserve ASG II's assets.

### 2. ASG II Intended to Defraud TSIL.

ASG II's transfer of its assets to ClearPoint was made "with actual intent to hinder, delay, or defraud any creditor of the debtor," and was thus a fraudulent transfer under Section 726.105(1)(a). Factors that indicate the debtor's intent include, among other things, that: (1) the debtor had been sued or threatened with suit prior to the transfer; (2) the transfer was substantially all of the debtor's assets; (3) the debtor did not receive reasonably equivalent value for the transfer; (4) the debtor was insolvent or became insolvent shortly after the transfer was made; (5) the transfer occurred shortly before or shortly after a substantial debt was incurred. FLA. STAT. § 726.105(2)(d), (e), (h), (i), (j). Actual intent to defraud is presumed if the debtor's conduct fits any one or more of these enumerated "badges of fraud" in the Act. *See* FLA. STAT. § 726.105(2). Significantly, "when the legal effect of a conveyance is to hinder or delay creditors, the intent to defraud will be presumed, regardless of the actual motives of the parties." *Munim v. Azar*, 648 So.2d 145, 152 (Fla. Dist. Ct. App. 1994) (quoting *Logan v. Logan*, 22 Fla. 561, 564 (Fla. 1886)). Moreover, under Section 105, a debtor's transfer may be fraudulent regardless of whether it was made before or after the creditor's claim arose. *See* FLA. STAT. § 726.105(1).

ASG II's intent to defraud is evident from the chronology of events:

- On July 21, 2006, TSIL invoiced ASG II $930,170 for certain assessments.

- On October 11, 2006, after ASG II refused to pay the invoice, TSIL filed the Cayman Litigation seeking payment for the assessments levied upon ASG II.

- On February 23, 2007, ASG II, still a defendant in the Cayman Litigation, transferred substantially all of its assets to ClearPoint but received nothing in exchange.

- On April 4, 2007, the Grand Court of the Cayman Islands enjoined ASG II from disposing or diminishing the value of its assets.

- On May 3, 2007, ASG II represented to the Grand Court that it is insolvent.

- On January 29, 2008, the Grand Court of the Cayman Islands awarded judgment to TSIL and observed that ASG II failed to raise any direct defense to TSIL's claims.

- ASG II does not have sufficient assets to satisfy the assessment levied upon it by TSIL and now that assessment has been reduced to judgment.

Numerous "badges of fraud" are manifest in the above facts. Perhaps the most egregious evidence of fraud is that ASG II gave its assets away after TSIL sued ASG II. Recognizing the substantial likelihood of a significant judgment against it, ASG II transferred all of its assets in exchange for nothing in order to put those assets beyond TSIL's reach. *See* FLA. STAT. § 726.105(2)(d) (actual intent is shown if debtor is sued or threatened with suit before it transferred assets). The fact that, as the Grand Court observed, ASG II marshaled no direct defense to TSIL's claims strongly indicates that ASG II knew that its assets were subject to collection when it transferred them, and that it thus transferred those assets in order to evade collection.

Moreover, ASG II became insolvent as a result of the transfer of substantially all of its assets. *See* Fla. Stat. § 726(2)(e), (i) (actual intent is shown when debtor transfers substantially all of its assets or when the debtor became insolvent shortly after the transfer is made). After it transferred its assets to ClearPoint (which then paid ALS for those assets), ASG II represented in the Cayman litigation that it was essentially judgment proof in that its assets consisted only of: (i) one preferred share stock in TSIL worth $36,000; (ii) $10,000 retained with its attorneys in the Cayman Islands; and (iii) an estimated $98,734.23 in accounts receivable due from various third parties. These factors are more than sufficient for the Court to presume intent to defraud and find ASG II's transfers were fraudulent. *See General Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498 (11th Cir. 1997) (quoting *Johnson v. Dowell*, 592 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1992) ("While '[a] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, … several of

them when considered together may afford a basis to infer fraud'"); *Woodell v. TransFlorida Bank*, 717 So. 2d 108, 109-110 (Fla. Dist. Ct. App. 1998) (acknowledging badges of fraud and finding intent to defraud and fraudulent conveyance).

In addition, by ensuring that ALS would receive the consideration ClearPoint paid for ASG II's assets, ASG II guaranteed that an entity affiliated with ASG II,[6] and controlled by the very same insiders who controlled ASG II,[7] received all the benefit of the transfer of ASG II's assets, while simultaneously protecting those assets from judgment. *See* FLA. STAT. § 726.105(a), (b) (intent to defraud is shown when the transfer or obligation is to an insider or when the debtor retained possession or control of the property transferred after the transfer).

### 3. The Assets ASG II Transferred to ClearPoint Could Have Been Used to Satisfy the Debt ASG II Owes to TSIL.

Finally, the assets that ASG II transferred could have been used to satisfy the debt it owes to TSIL. *See Huntsman Packaging*, 992 F. Supp. at 1446 (fraudulent conveyance under Section 105(1)(a) when there is "a conveyance of property which could have been applicable to the payment of the debt due"). However, as a consequence of ASG II's fraudulent transfer to ClearPoint, TSIL is presently hindered, delayed, and prevented from collecting the debt ASG II owes it. This the law does not allow. *See United States v. Fernon*, 640 F.2d 609, 613 (5th Cir. 1981) (internal quotation omitted) (affirming finding of fraudulent transfer and observing that

---

[6] Under the fraudulent transfer statute, an affiliate includes any individual, corporation, organization, association, or legal or commercial entity that directly or indirectly owns, controls, or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor. FLA. STAT. § 726.102(1)(a). An affiliate is also defined as any individual, corporation, organization, association, or legal or commercial entity who operates the debtor's business or who controls substantially all of the debtor's assets. FLA. STAT. § 726.102(1)(d).

[7] An insider is defined to include a director of the debtor, an officer of the debtor, a person in control of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor. FLA. STAT. § 726.102(7)(b). Here, Defendant Michael J. O'Donnell is the managing member of ALS and ASG II, and he also signed the Purchase Agreement on behalf of ALS and ASG II, among others. For both entities, he signed in the capacity of CEO/Manager. Michael J. O'Donnell also signed the Purchase Agreement as shareholder, along with his son, Kevin O'Donnell, a director of TSIL, Joseph Raymond Jr., who was a managing member of Advantage Services Group, LLC.

"fraud upon creditors consists in the intention by the debtor to prevent his creditors from recovering their just debts by withdrawing his property from the reach of his creditors"); *United States v. Ressler*, 433 F. Supp. 459, 464 (S.D. Fla. 1977) (internal quote marks omitted) (for a conveyance to be fraudulent, "[t]he requirement is merely an intentional act prejudicial to creditors.").

### B. TSIL Has a Substantial Likelihood of Success on its Section 106(1) Claim.

TSIL also has a substantial likelihood of success on its claim that the transfer of ASG II's assets is fraudulent under FLA. STAT. § 726.106(1). Under that provision, a transfer is fraudulent when: "1) the creditor's claim arose before the transfer was made; 2) the debtor did not receive a reasonably equivalent value in exchange for the transfer; and 3) the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Fitzgerald v. Fitzgerald*, 95-1531-CIV, 1996 U.S. Dist. LEXIS 20392, *6 (S.D. Fla., Nov. 13, 1996); *General Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1499 (11th Cir. 1997). A showing of the debtor's actual intent is not required to prove a fraudulent transfer under Section 106(1). *See General Trading*, 119 F.3d at 1498.

#### 1. TSIL's Claim Arose Before the Fraudulent Transfer Was Made.

Here, TSIL's claim arose prior to the transfer of ASG II's assets pursuant to the Purchase Agreement. TSIL invoiced ASG II on July 21, 2006 and filed suit in the Cayman Islands on October 11, 2006. ASG II fraudulently transferred its assets to ClearPoint on February 23, 2007, well after TSIL's claim arose.

#### 2. ASG II Did Not Receive Reasonably Equivalent Value in Exchange for Substantially All of Its Assets.

ASG II did not receive reasonably equivalent value in exchange for substantially all of its assets. Indeed, it received <u>nothing</u> in return for selling almost everything it owned. *Ressler*, 433

F. Supp. at 464 ("With respect to creditors existing at the time of the conveyance under attack, under Florida law a conveyance without consideration by one who is indebted is presumptively fraudulent, regardless of the actual intent of the transferor.") Instead, all the consideration was paid to ALS and/or its affiliates.

### 3. ASG II Was Rendered Insolvent As a Result of the Fraudulent Transfer.

Moreover, ASG II became insolvent as a result of the transfer of ASG II's assets, as it has reported to the Grand Court of the Cayman Islands that it owns a share of TSIL stock, $10,000 in cash held by its Cayman Islands lawyers, and less than $100,000 in accounts receivable. Accordingly, ASG II is insolvent because TSIL's claims against ASG II are far greater than the sum of ASG II's remaining assets. *See United States v. Exec. Auto Haus, Inc.*, 234 F. Supp. 2d 1253, 1258 (M.D. Fla. 2002) (quoting FLA. STAT. § 726.103(1) ("a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.")).

\*     \*     \*     \*

Thus, having satisfied each of the elements of both causes of action it has asserted under the Act (either one of which is sufficient), TSIL has demonstrated a substantial likelihood of success on its claim that the transfer of ASG II's assets was fraudulent.

## IV. TSIL WILL SUFFER IRREPARABLE INJURY UNLESS AN INJUNCTION IS ISSUED.

TSIL is currently unable to satisfy its judgment against ASG II and thus has no adequate legal remedy. *BellSouth Telecomms., Inc.*, 425 F.3d at 968 (party moving for preliminary injunction must show that irreparable injury will be suffered unless injunction is issued). Absent an injunction that prohibits the continued dissipation of ASG II's assets, TSIL will be foreclosed from collecting its judgment against ASG II. Therefore, TSIL's judgment is neither potential nor speculative. Further, due to the fraudulent transfer, TSIL's injury is irreparable because it cannot

presently collect its judgment from the apparently judgment proof ASG II.  *See Tri-State Generation & Transmission Asso. v. Shoshone River Power, Inc*., 805 F.2d 351, 355 (10th Cir. 1986) ("Difficulty in collecting a damage judgment may support a claim of irreparable injury."); *Pashaian v. Eccleston Properties*, No. 95 Civ. 1920 1995 U.S. Dist. LEXIS 4532, *14 (S.D.N.Y. April 7, 1995) (ordering injunctive relief to ensure that the plaintiff can collect on his judgment due to the defendants' intent to frustrate plaintiff's judgment by  "maneuvering of assets among controlled entities" with actual intent to defraud).

If ClearPoint continues to pay consideration to ALS, and if ALS is allowed to dispose of the assets, then TSIL will have no legal relief.  *See ITT Community Development Corp. v. Barton*, 457 F. Supp. 224, 233-34 (M.D. Fla. 1978) (preliminary injunction appropriate when dissipation of funds would render plaintiffs' legal remedies inadequate); *Kreuzfeld A.G. v. Carnehammer*, 138 F.R.D. 594, (S.D. Fla. 1991) (finding remedy meaningless if defendant could transfer assets to another corporation and beyond plaintiff's reach); *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.)*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994) (noting that irreparable harm may be present when "money judgment will go unsatisfied absent equitable relief.").

TSIL has thus established that it will suffer irreparable harm when an injunction is issued.

## V. THE THREATENED INJURY TO TSIL OUTWEIGHS ANY POSSIBLE DAMAGE THE PROPOSED INJUNCTION MIGHT CAUSE.

TSIL's injury far outweighs any potential damage that an injunction may cause to ClearPoint, ALS or ALS's affiliates.  *See Rogers v. Windmill Pointe Village Club Ass'n*, 967 F.2d 525, 526 (11th Cir. 1992) (party seeking preliminary injunction must show that "the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party").

### A.     An Injunction Will Protect TSIL From Further Harm.

Should an injunction be denied, TSIL may be forever foreclosed from collecting on its judgment against ASG II.  While ASG II is insolvent, its assets have been and will continue to be subject to further disposition, whether by ClearPoint, ALS, or any of ALS's entities.  An injunction will prevent the assets from being further disposed and put permanently out of TSIL's reach.

Further demonstrating how far the balance of equities weighs in TSIL's favor is the fact that TSIL has already been awarded a judgment in the Cayman Action.  The injunctive relief that TSIL seeks in the instant motion will not permanently disable ClearPoint, ALS, or any ALS affiliate; however, the denial of an injunction may forever preclude TSIL from collecting on its judgment due to the continued dissipation of ASG II's assets.  Ultimately, the balance of harms cannot militate against an injunction when such relief is the precise remedy that the Act provides to prevent the further disposition of assets or other property.

### B.     An Injunction Will Cause No  Harm to ClearPoint.

In stark contrast to the harm that TSIL will suffer absent an injunction, ClearPoint will not be damaged as a result of the proposed injunction, which is designed to preserve the status quo by preventing the further dissipation of assets.  To this extent, an injunction can be easily fashion to only require that ClearPoint make any future transfers or conveyances pursuant to the Purchase Agreement into the Registry of the Court.

### C.     An Injunction Will Cause No Meaningful Harm to ALS or Its Affiliates.

In balancing the equities it is important to consider that ASG II fraudulently transferred ASG II's assets to put them out of TSIL's reach and to allow ALS to receive all the consideration for those assets.  Thus, any hardship Defendants may claim as a result of the injunction is attributable to their own wrongdoing and should be afforded minimal, if any, weight.  Moreover,

as is the case with ClearPoint, the proposed injunction would only require ALS and any of its entities to refrain from transferring, conveying, redeeming or taking any other action with the assets provided by ClearPoint pursuant to the Purchase Agreement.

Ultimately, any inconvenience that ALS or ClearPoint may encounter pales in comparison to the hardship that TSIL currently endures and will permanently suffer if an injunction does not issue and prevent the further disposition of ASG II's assets.

## VI.     AN INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.

Creditors have a broad range of remedies under the Act. A creditor may void the transaction in order to satisfy its claims. FLA. STAT. § 726.108(1)(a). A creditor may also obtain an attachment or other provisional remedy against the asset transferred or other property of the transferee. FLA. STAT. § 726.108(1)(b). Most important to the instant case, a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property"; or "any other relief the circumstances may require." FLA. STAT. § 726.108(a)(1), (3). Here, an injunction should be granted because it would benefit the public interest. *See Rogers*, 967 F.2d at 526 (party moving for preliminary injunction must show "that the injunction would not be adverse to the public interest").

As noted above, the Act specifically provides for injunctive relief to remedy fraudulent transfers. By enacting Section 108(c), the Florida legislature has already determined that it is in the public's interest to enjoin the transfer of assets intended to defraud creditors. *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (finding public interest served when state law provided for injunctive relief); *see also Baldree v. Cargill, Inc.*, 758 F. Supp. 704, 707 (M.D. Fla. 1990) (finding public interest favored entry of preliminary injunction because Congress enacted statute to protect against alleged conduct). In seeking this injunction, TSIL is

merely invoking the Act to redress Defendants' wrongdoing. By ordering injunctive relief and affirming the will of the legislature, the Court will benefit the public interest.

## VII.  CONCLUSION

For the foregoing reasons, this Court should grant TSIL's motion for a preliminary injunction.

February 12, 2008                                                                /s/   Jeffrey A. Rossman

    Bruce J. Berman, Esq.                                            Steven S. Scholes, Esq.
    Fla. Bar No. 159280                                                 E-mail: sscholes@mwe.com
    E-mail: bberman@mwe.com                                             Jeffrey A. Rossman, Esq.
    McDermott Will & Emery LLP                                          E-mail: jrossman@mwe.com
    201 S. Biscayne Blvd., Ste. 2200                                    Admitted to practice *pro hac vice*
    Miami, Florida  33131                                               McDermott Will & Emery LLP
    Tel.  305-358-3500                                                  227 W. Monroe
    Fax  305-347-6500                                                   Chicago, IL 60606
                                                                        Tel. 312-984-7741
                                                                        Fax 312-984-7700

*Counsel of Record for Plaintiff Temporary Services Insurance, Ltd.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that we have this 12th day of February, 2008, electronically filed the forgoing *Plaintiff's Emergency Application for Preliminary Injunction Against Defendants ClearPoint, ALS and ASG* with the Clerk of Court using the CM/ECF system.

                                                           /s/   Jeffrey A. Rossman
                                                           Jeffrey A. Rossman

CHI99 4939946-3.046281.0060